UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------------- X

MARY J. BARKER,                                                    :   09 Civ

                                                           :

               Plaintiff,                                      :   **COMPLAINT**

                                                            :

          -against-                                          :   Plaintiff Demands A

                                                            :   Trial By Jury

UBS AG and UBS SECURITIES LLC,                          :

                                                            :   **3 0 9 C V 2 0 8 4** *(C FJ)*

               Defendants.                                :

--------------------------------------------------------------------- X

        Plaintiff, Mary J. Barker ("Barker"), by her attorneys, Liddle & Robinson,
L.L.P., and Zeldes, Needle & Cooper, P.C., for her Complaint against Defendants, UBS
AG and UBS Securities LLC (collectively "Defendants" or "UBS"), alleges as follows:

### THE NATURE OF THE ACTION

        1.     This is a civil action for damages and remedies brought under the
employee protection ("whistleblower") provisions of Section 806 of the Corporate and
Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of
2002, 18 U.S.C. § 1514A et seq. ("Sarbanes-Oxley"), and the Age Discrimination in
Employment Act, as amended (the "ADEA"). Defendants engaged in a pattern of
adverse treatment against Plaintiff, and terminated her employment, in violation of
Sarbanes-Oxley and the ADEA.

## THE PARTIES

2.      Barker is a 55-year old female residing at 88 Southfield Avenue, Apartment 203, Stamford, Connecticut 06902. Barker was employed by UBS from May 1998 until May 23, 2008 in its Stamford, Connecticut location.

3.      Defendant UBS AG is an international financial services company. Upon information and belief, UBS AG is a publicly held entity organized and existing as a limited company under the laws of Switzerland, with one of its three American headquarters located in Stamford, Connecticut, at 201 Tresser Boulevard, where Barker worked when she was employed with Defendants.

4.      Defendant UBS AG is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).

5.      Plaintiff worked for UBS Investment Bank, one of UBS AG's three functional business groups, which draws its resources from Defendants UBS AG and UBS Securities LLC, amongst others.

6.      Upon information and belief, Defendant UBS Securities LLC is a wholly-owned subsidiary of UBS AG.

7.      Upon information and belief, Defendant UBS Securities LLC is a Delaware corporation.

2

8. Upon information and belief, Defendant UBS Securities LLC is the U.S. broker dealer for UBS Investment Bank, with its principal place of business located at 677 Washington Boulevard, Stamford, Connecticut 06901.

9. Plaintiff was an employee of Defendant UBS Securities LLC.

10. Plaintiff's role as an employee of Defendant UBS Securities LLC required that she perform functions on behalf of Defendants UBS AG and UBS Securities LLC through UBS Investment Bank.

11. Upon information and belief, the business operations of Defendants UBS AG and UBS Securities LLC were intertwined to such a degree that they constituted an integrated employer and/or UBS Securities LLC was an agent of UBS AG for purposes of Plaintiff's employment, within the meaning of Sarbanes-Oxley.

12. Upon information and belief, Defendants UBS AG and UBS Securities LLC share common senior management through UBS Investment Bank.

13. Upon information and belief, Defendants UBS AG and UBS Securities LLC share common ownership and financial control because, among other things, Defendant UBS Securities LLC is a wholly-owned subsidiary of Defendant UBS AG.

14. Upon information and belief, Defendant UBS AG substantially determined and controlled the employment policies and practices for employees of Defendant UBS Securities LLC.

15. According to UBS AG's 2007 Annual Report, Defendant UBS AG's human resources function for its subsidiaries, including Defendant UBS Securities LLC, is centrally administered through UBS AG.

16.     Upon information and belief, Defendant UBS AG's issuance of stock and options under its equity compensation plans and savings and retirement plans for its employees, including those of Defendant UBS Securities LLC, is administrated through UBS AG.

17.     Upon information and belief, Defendant UBS AG's Separation Program for its terminated employees, including those of Defendant UBS Securities LLC, is administrated through UBS AG.

18.     According to UBS AG's 2007 Annual Report, Defendant UBS AG's legal and compliance function for its subsidiaries, including UBS Securities LLC, is centrally administrated through UBS AG.

19.     According to UBS AG's 2007 Annual Report, Defendant UBS AG's risk control and accounting function for its subsidiaries, including UBS Securities LLC, is centrally administrated through UBS AG.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

21.     UBS AG and UBS Securities LLC constitute an integrated employer and/or UBS Securities LLC is an agent of UBS AG within the meaning of Sarbanes-Oxley.

22.     On or about September 15, 2009, the U.S. Department of Labor, acting through its agent, the Regional Administrator for the Occupational Safety and

4

Health Administration ("OSHA"), Region II, issued its findings in response to Barker's complaint alleging that UBS terminated her employment in violation of Sarbanes-Oxley.

23.      Pursuant to 29 CFR 1980.100(a), subject matter jurisdiction under Sarbanes-Oxley exists because UBS violated Sarbanes-Oxley by terminating Barker's employment in retaliation for Barker having reported to supervisory individuals misconduct involving inaccurate accounting of UBS's holdings of exchange seat shares, including their omission from UBS's mark-to-market system for daily valuation, which Barker reasonably believed could subject UBS to liability for violation of federal securities law, including Rule 10(b)(5) of the Securities Exchange Act of 1934.

24.      On or about September 21, 2009, in accordance with 29 CFR §§ 1980.105(b) and 1980.106(a), Barker submitted a letter asserting her objections and request for a hearing before an Administrative Law Judge.

25.      On or about October 1, 2009, the assigned Administrative Law Judge, Janice K. Bullard, of the Office of Administrative Law Judges for the U.S. Department of Labor, issued a Notice of Hearing and Pre-Hearing Order on Barker's claims under Sarbanes-Oxley.

26.      On or around October 20, 2009, Barker submitted to Judge Bullard formal notice of her intent to file a Complaint in federal district court in accordance with 29 CFR 1980.114(b).

27.      Ms. Barker filed her original Complaint under Sarbanes-Oxley with OSHA on August 4, 2008.

28.     Because more than 180 days have elapsed from the time Barker filed her Complaint with OSHA and a final decision has not yet been issued, Barker is asserting her right to bring an action in federal district court.

29.     On or about October 27, 2009, Barker received a Notice of Right to Sue (Issued on Request) letter from the EEOC (attached hereto as Exhibit A), in connection with her Charge of Discrimination, filed March 2, 2009, on the basis of age under ADEA.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred within the District of Connecticut.

## **FACTS**

31.     Barker was employed by UBS from May 1998 until May 6, 2008, when UBS notified her that it was terminating her employment, effective May 23, 2008.

32.     The Equities Americas division of UBS Investment Bank provided back office support to its Equities Proprietary Trading desk through its Business Management Group.

33.     At the time of the termination of her employment, Barker was an Associate Director in the sub-unit of the Business Management Group responsible for supporting the Equities Proprietary Trading desk.

34.     Barker was a loyal employee of UBS, and worked in its Stamford, Connecticut office, for approximately ten years.

35.     Throughout her employment with UBS, Barker was qualified for her position and performed her duties in a professional and competent manner.

6

36.     Barker was age 44 when she began her career with UBS, on May 10, 1998, as an Administrative Assistant reporting to Executive Director Mark Bridges in the office of the COO for UBS's Equities Project Management Office.

37.     Barker consistently received positive performance ratings and positive reinforcement from her supervisors.

38.     In 2004, UBS promoted Barker to Associate Director.

39.     In September 2005, UBS transferred Barker to a position in the Equities Americas division of UBS Investment Bank. Barker joined a sub-unit of the Business Management Group responsible for providing back office support to the Equities Proprietary Trading desk.

40.     In this position, Barker reported to Karen Harford. Gerald Hees, a Managing Director and Business Manager, headed Barker's group.

41.     Hees reported directly to the COO for Equities Americas.

42.     Approximately two weeks later, Barker's line supervisor, Karen Harford, left UBS. Harford had been instrumental in recruiting Barker into the Business Management Group.

43.     In January 2006, UBS assigned Angela Sinni, a less experienced and lesser qualified individual who was almost twenty years Barker's junior, to Barker's group as her direct line manager. Upon information and belief, Sinni is approximately Over the course of 2006, Barker continued to perform most of Harford's former responsibilities and those of her own.

44.     In December 2006, Barker began assisting Don Francese, Business Manager for the Equities Exchange Traded Derivatives desk, on the valuation of assets

7

held on its behalf by UBS AG and UBS Securities LLC. The merger of the New York Mercantile Exchange (NYMEX) and the Commodity Exchange (COMEX), as well as UBS's acquisition of ABN Amro's global futures and options business, had resulted in a redistribution of UBS's holdings of exchange seat assets.

45.     By January 2007, as result of her work relating to the NYMEX-COMEX merger and the ABN Amro acquisition, Barker realized that certain of the Equities Exchange Traded Derivatives desk's historical exchange seat holdings were undervalued and others were not accounted for at all.

46.     By February 2007, Barker maintained an ongoing record of inventory to be reconciled with UBS's internal accounting and controls by inquiring directly of each exchange as to its extent of exchange seats held by UBS overall.

47.     Later in February 2007, Barker informed Sinni of UBS's failure to disclose, in accordance with its obligations under federal securities law, certain of its holdings of exchange seat assets.  Sinni did not address Barker's concerns or provide assistance.

48.     On May 10, 2007, Barker met with the lateral support personnel from UBS's operations and control functions that were assisting in her accounting investigation to discuss the growing portfolio of UBS's unmarked exchange seat shares. As a result of the recent exchange mergers and UBS's acquisitions, UBS had received a significant number of exchange seat shares that were booked incorrectly, if at all.

49.     Over the course of May 2007, Barker and her group accumulated an ongoing list of outstanding discrepancies for those exchange seat shares not accounted

8

for on UBS's balance sheet so that they could present a full inventory of the unreported shares.

50.    In May 2007, Barker met with Patricia Shelton, UBS's Human Resources Client Relationship Manager, to express her concerns regarding Sinni's failure to report the accounting violations Barker raised.

51.    On July 26, 2007, due to Sinni's failure to address the accounting improprieties she raised, Barker turned to Eric Romstadt and Adam Rosenthal, of the Operational Risk Group, to report her findings in connection with the exchange seat investigation and her reasonable belief that the failure to properly disclose this info could subject UBS to liability for making materially misleading statements in UBS's financial statements, in violation of federal securities laws and regulation, including Rule 10(b)(5) of the Securities Exchange Act of 1934.

52.    The two agreed that Barker should complete the "Gap Analysis" that she had begun to pinpoint the omissions from UBS's financial statements and, in addition, that Clinton Mosley, their superior in the global COO office, should be notified of the situation immediately.

53.    On or around August 8, 2007, Hees learned that Barker had reported the exchange seat accounting issue to Romstadt and Rosenthal and confronted Barker. Hees accused Barker of having gone around him. Hees directed Barker not to disclose anything further outside their group.

54.    Barker's completed Gap Analysis illustrated that the respective purchases of exchange seats made by each of UBS's trading desks were not accurately marked on UBS's balance sheet because they were assigned to a separate collective asset

portfolio not managed by the desks themselves. Barker learned that those shares were not marked appropriately, if at all, and were not properly reported on UBS's balance sheet.

55. In August 2007, Barker again expressed her heightened concerns to Shelton regarding Sinni's failure to address the exchange seat accounting issue. By the time Barker and Shelton met, however, Sinni had left Barker's group and Kevin Milgram subsequently replaced Sinni and became Barker's line supervisor in September 2007.

56. Barker's concerns were augmented when she attended a meeting in early September 2007 with members of the Business Management Group where Hees discussed how to "spin" the accounting problem, rather than address it straight on.

57. Not long after, Barker attended a meeting with senior management present, including John Ingrilli, the newly appointed COO for Equities Americas. The meeting was held for Hees to present the proposed sale of a significant amount of newly accounted for CME exchange seat shares. At that meeting, Ingrilli and the other senior manager seemed to believe, however, that any discrepancy in the exchange seat accounting was a "mistake," indicating by innuendo that Barker must have erred, because at that time she was responsible for handling the portfolio of exchange seat shares. Hees failed to mention that Barker had only managed the exchange seat accounting issues since December 2006, and that the holding at issue extended back to November 2000.

58. By September 19, 2007, Barker's ongoing investigation revealed that UBS held a total inventory of 557,682 CME exchange seat shares, and that 145,238 of these share were improperly accounted for on UBS's accounting books prior to that summer of 2007, if at all.

10

59.     On September 21, 2007, UBS sold 145,238 CME exchange seat shares for a net sale value of $79,308,670, indicating that UBS had previously held more than $300 million of exchange seat shares off its books.

60.     On September 24, 2007, Barker was scheduled to meet with Ingrilli regarding a matter separate from the exchange seat accounting issues. Prior to the meeting, Hees directed Barker that she not disclose or discuss the exchange seat accounting situation with Ingrilli. Hees told Barker that reporting of the exchange seat accounting improprieties was "not [her] place" and that she "should not go there" with Ingrilli.

61.     On October 16, 2007, Barker met with Mia Edwards, Managing Director and Head of Compliance, to report Hees's questionable directives to not disclose the exchange seat accounting issues to senior management. Edwards advised Barker to disclose the matter immediately to Ingrilli.

62.     On October 19, 2007, Barker met with Ingrilli to discuss her concerns regarding Hees's behavior in connection with the reconciliation of the exchange seat accounting. Ingrilli expressed concern as to why Hees had attempted to prevent Barker from disclosing the issue to him.

63.     On November 23, 2007, UBS honored Barker for her efforts in connection with the reconciliation of the exchange seat accounting with a Thank You Award.

64.     On December 04, 2007, UBS senior management approved the sale of 34,180 Class A ICE exchange seat shares that were previously unrecorded and realized a profit of approximately $5,608,675 million from those shares. Barker's work had

11

contributed to the discovery of the existence of these shares, which UBS had previously "written off" altogether.

65.     Also in December 2007, Barker learned that UBS had failed to record its holding of 8,400 exchange seat shares of NYMEX, which amounted to approximately $1.2 million at that time.

66.     In January 2008, Hees stunned Barker by giving her a poor PMM rating of 2C for 2007.

67.     Additionally, Barker did not receive even a cost-of-living raise for 2008.

68.     In January 2008, UBS selected Anne Bowlus, an Associate Director outside Barker's group who was in her twenties, for an advanced position reporting directly to Hees. Barker was not considered for this position, despite her demonstrated hard work and success in covering Harford's responsibilities, having reconciled the portfolio of exchange seat shares and received a Thank You award, and having aggressively taken on various projects and outside assignments during her time in EBMG.

69.     On January 25, 2008, Barker met with Milgram to discuss her concerns regarding her PMM rating. During that meeting, Milgram asked Barker, "Do you need this job?"

70.     On March 26, 2008, Barker again met with Milgram to discuss her performance objectives for 2008.   Barker expressed to Milgram that she was experiencing a pattern of adverse treatment, including being overlooked for project assignments and not receiving support comparable to that provided to her co-workers.

71.    In April 2008, Milgram contacted the Human Resources Department to institute an investigation into Barker's complaint. Gayle Wasserman and Cynthia Chelala, of UBS's Human Resources, met with Barker to discuss her concerns on April 3, 2008, and again on April 7, 2008.

72.    On May 2, 2008, Wasserman and Chelala, along with Jonathan Plisser, an EEOC Officer of the firm, informed Barker that UBS had investigated her concerns of unfair treatment and found no inappropriate conduct.

73.    On May 6, 2008, UBS terminated Barker's employment, ostensibly as part of a reduction-in-force.

74.    Following her disclosure to senior management of the accounting inconsistencies in connection with UBS's holdings of exchange seat shares, UBS had discriminated and retaliated against Barker by subjecting her to a pattern of adverse treatment that ultimately resulted in her termination.

75.    Upon information and belief, UBS's internal data for the period 2/29/08 – 5/06/08 reflect that Barker was in the top five in terms of age for all Equities Business Management, which employed 53 individuals during that time.

76.    Upon information and belief, Barker was one of only five individuals over the age of 40, out of the eight individuals terminated as part of UBS's May 6, 2008 reduction-in-force.

77.    The pattern of adverse treatment and other circumstances and facts leading up to and surrounding Barker's termination indicate that UBS's decision was discriminatory on the basis of Barker's age, and retaliatory on the basis of Barker's

reporting of UBS's inaccurate accounting of its exchange seat holdings and Barker raising her concerns to her supervisors to no avail.

## FIRST CLAIM

(Discrimination and Retaliation in Violation of Sarbanes-Oxley)

78.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 77 as if set forth separately herein.

79.     Barker was an employee of UBS and was discriminated and retaliated against by UBS in violation of Sarbanes-Oxley.

80.     Defendant UBS AG is a company within the meaning of 18 U.S.C. § 1514A in that it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).

81.     Defendant UBS Securities LLC is also a company subject to Sarbanes-Oxley because UBS AG and UBS Securities LLC constitute an integrated employer and/or UBS Securities LLC is an agent of UBS AG for purposes of Sarbanes-Oxley.

82.     Barker engaged in protected activity through her investigation into and subsequent reporting to supervisory individuals of conduct involving the inaccurate accounting of UBS's holdings of exchange seat shares, including their omission from UBS's mark-to-market system for daily valuation.

83.     Barker reasonably believed UBS's conduct constituted a violation of federal securities law, including Rule 10(b(5) of the Securities Exchange Act of 1934.

14

84.     UBS subjected Barker to retaliation and ultimately terminated her employment for her having reported the above-detailed misconduct.

85.     Barker's protected activity was a contributing factor in UBS's unlawful discrimination and retaliation against her, in violation of Sarbanes-Oxley.

86.     As a result of the discrimination described above, Barker has suffered a substantial loss of earnings and benefits. Accordingly, UBS is liable to Barker for reinstatement, back pay with interest, and compensation for any special damages sustained including litigation costs, expert witness fees and reasonable attorney's fees.

## SECOND CLAIM

(Discrimination and Retaliation on the Basis of Age in Violation of the ADEA)

87.     Barker repeats and realleges the allegations contained in paragraphs 1 through 86 as if set forth separately herein.

88.     At all relevant times, Barker was an "employee" of UBS under 29 U.S.C. § 630(f) of the ADEA.

89.     UBS is an "employer" under 29 U.S.C. § 630(b) and thus subject to the provisions of the ADEA.

90.     By its actions detailed above, UBS has unlawfully discriminated and retaliated against Barker on the basis of her age in violation of the ADEA.

91.     As a result of the discrimination described above, Barker has suffered a substantial loss of earnings and benefits and will continue to suffer such losses in the future. Accordingly, UBS is liable to Barker for both back pay and reinstatement or front pay in amounts as yet undetermined, plus attorneys' fees, prejudgment interest and costs.

92.     The conduct of UBS in discriminating against Barker on the basis of her age was willful entitling her to an additional sum of liquidated damages pursuant to U.S.C. § 626(b).

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.     On the First Claim, reinstatement, back pay with interest, and compensation for any special damages sustained including litigation costs, expert witness fees and reasonable attorney's fees;

b.     On the Second Claim, back pay, reinstatement or front pay, compensatory damages, punitive damages, attorneys' fees, costs and interest, in amounts to be determined at trial; and

c.     Such other and further relief as the Court deems appropriate under the circumstances.

PLAINTIFF DEMANDS A JURY TRIAL.

The Plaintiff
Mary J. Barker

By _____
Kristen L. Zaehringer (ct27044)

ZELDES, NEEDLE & COOPER
A Professional Corporation
1000 Lafayette Boulevard
Bridgeport, Connecticut 06604
Tel: (203) 333-9441
Fax: (203) 333-1489
E-Mail: jorleans@znclaw.com

16

James A. Batson
Sherry M. Shore

LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, NY 10022
Tel :  (212) 687-8500
Fax :  (212) 687-1505
e-mail : msusswein@liddlerobinson.com

Her Attorneys

# EXHIBIT A

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Mary Barker**
    **C/O Sherry Shore, Esquire**
    **800 Third Avenue**
    **New York, NY 10022**

From:  **Boston Area Office**
    **John F. Kennedy Fed Bldg**
    **Government Ctr, Room 475**
    **Boston, MA 02203**

[ ]    On behalf of person(s) aggrieved whose identity is
     CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2009-00680 | Feng K. An,<br>**Supervisory Investigator** | **(617) 565-3192** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]    More than 180 days have passed since the filing of this charge.

[ ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[ ]    The EEOC is terminating its processing of this charge.

[ ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[X]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*(signature)*

**Robert L. Sanders,**
**Area Office Director**

OCT 2 7 2009

*(Date Mailed)*

Enclosures(s)

cc:  **UBS SECURITIES LLC**
    **c/o D. Davis, Esq.**
    **Gibson, Dunn, et al.**
    **1050 Connecticut Ave., N.W.**
    **Washington, DC 20036**

Enclosure with EEOC
Form 161 (2/08)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination In Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 – in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# FACTS ABOUT FILING AN EMPLOYMENT DISCRIMINATION SUIT IN FEDERAL COURT IN THE STATE OF CONNECTICUT

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. A lawsuit can be filed at the following U.S. District Court locations in Connecticut:

- The **United States District Courts for the District of Connecticut** are located at:

    o  The Abraham Ribicoff Federal Building, 450 Main Street, Hartford, Connecticut 06103, or by contacting the Clerk of the Court Office at (860) 240-3200

    o  141 Church St., New Haven, Connecticut 06510, or by contacting the Clerk of the Court Office at (203) 773-2140

    o  The Brien McMahon Federal Building, 915 LaFayette Blvd., Bridgeport, Connecticut 06604, or by contacting the Clerk of the Court Office at (203) 579-5861

    o  14 Cottage Place, Waterbury, Connecticut 06702, or by contacting the New Haven Clerk of the Court at (203) 773-2140

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within **90 days** of the date you receive the enclosed final action. Once this 90 day period is over, unless you have filed suit, you will have lost your right to sue.

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit. You may file a complaint in federal court without a lawyer which is called a *pro se* complaint. Every district court has either a clerk or staff attorney who can assist you in filing *pro se*. To find out how to file a *pro se* complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may vary from district to district.

You may, however, wish to retain a lawyer in order to adequately protect your legal rights. Whether you retain a private attorney, or file *pro se*, you must file your suit in the appropriate court within 90 days of receiving this mailing.

## WHAT IF I WANT A LAWYER BUT CAN'T AFFORD ONE?

If you can't afford a lawyer the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer. You should consult with the office of the district court that assists *pro se* complainants for specific instructions on how to seek counsel.

Generally, the U.S. District Court charges a $350.00 filing fee to commence a lawsuit. However the court may waive the filing fee if you cannot afford to pay it. You should ask the office of the District Court that assists *pro se* complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may be of assistance to you in finding a lawyer to assist you in ascertaining and asserting your legal rights:

|  |  |
|---|---|
| American Bar Association | (312) 988-5522 |
| The Connecticut State Bar Association | (860) 223-4400 |
| National Employment Lawyers Association Referral Service | (212) 819-9450 |

Your County, City of Municipal Lawyers or Bar Association may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge to be destroyed after 2 years from the date of a no cause determination or six months after other types of final actions. If you file a suit, and wish us to retain your file for more than the normal retention period, you or your attorney should forward a copy of your court complaint to this office within 10 days after you file suit. IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD ALSO NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.