UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARY J. BARKER, :
    Plaintiff, :
:
v. : 3:09-cv-2084 (CFD)
:
UBS AG and UBS SECURITIES LLC, :
    Defendants. :

**RULING ON MOTION TO DISMISS**

The plaintiff, Mary Barker ("Barker"), brings suit against UBS AG and UBS Securities LLC (collectively, "UBS") for discrimination and retaliation in violation of the Sarbanes-Oxley Act's whistleblower provision, 18 U.S.C. § 1514A. Barker also alleges age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. UBS now moves to dismiss both counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, claiming that Barker has failed to state a plausible claim upon which relief can be granted. For the reasons that follow, UBS's motion is granted in part and denied in part.

**I.  Factual Background**[1]

Barker was an employee in UBS's Stamford, Connecticut, office for approximately ten years, from May 1998 until May 2008. When she began her employment at UBS, she held the position of Administrative Assistant to Executive Director Mark Bridges but was promoted to the position of Associate Director in 2004. In September 2005, UBS transferred Barker to a

---

[1] These facts are taken from the allegations of the plaintiff's complaint. The allegations must be assumed true for the purposes of resolving the motion to dismiss.

-1-

position in the Equities Americas Division, where she was responsible for providing support to the Equities Proprietary Trading desk.

In December 2006, Barker was assigned the task of reconciling UBS's existing exchange seat shares[2] with former company records. This valuation was necessary because a recent merger of the New York Mercantile Exchange and the Commodity Exchange had resulted in a redistribution of UBS's holdings of exchange seat assets. During this reconciliation effort, Barker discovered that certain of UBS's historical exchange seat holdings had been improperly accounted for, or not accounted for at all, on UBS's balance sheet. According to Barker, she went well beyond the scope of her original assignment to create and record an inventory of all UBS's exchange seat shares, including those that had never before been reported on the firm's balance sheet. Ultimately, UBS realized approximately $80 million from the sale of exchange seats that had previously been overlooked.

In February 2007, Barker informed her manager, Angela Sinni, of UBS's failure to disclose the seat holdings in accordance with federal securities law. Sinni apparently did not address Barker's concerns or provide assistance, nor did she report Barker's findings to higher management. Frustrated at Sinni's silence, Barker then met with UBS Operational Risk officers, Eric Romstadt and Adam Rosenthal, on July 26, 2007, to present her findings and express concern that UBS might be subject to liability for its failure to properly report the exchange seat shares on the company's balance sheet. Romstadt and Rosenthal notified their supervisor,

---

[2] Exchange seat shares are assets that give a company trading rights to trade on a particular stock exchange.

Clinton Mosley, in the global Chief Operating Officer's office, who in turn notified Sinni's supervisor and the head of Barker's group, Equities Americas, Gerald Hees.

According to Barker, Hees reprimanded her in early August 2007 for having allowed Mosley to learn of the accounting omissions and told her not to disclose or discuss the situation with any one else outside their group. A few weeks later, in September 2007, Barker attended a meeting where Hees allegedly expressed concern about how to "spin" the exchange seat issue to UBS management. Soon after, Barker met the newly-appointed Chief Operating Officer for Equities Americas, John Ingrilli. However, on September 24, 2007, Barker was instructed by Hees not to discuss anything related to the exchange seat accounting omission with Ingrilli. According to Barker, Hees told her that reporting discrepancies was "not her place" and that she "should not go there" with Ingrilli. Barker reported this conversation to Mia Edwards, head of UBS's Compliance Department, who told her to disregard Hees' instructions and encouraged her to speak with Ingrilli about the exchange seat matter. Barker did so. For her work on the exchange seat project and the resulting profit to UBS, UBS management ultimately awarded Barker a "Thank You Award" on November 23, 2007.

Nonetheless, according to Barker, Hees began retaliating against her for her effort in reporting the exchange seat shares. Barker was given a poor performance rating at the end of 2007 and was denied a cost-of-living increase for 2008. According to Barker, she was passed over for an advanced position reporting to Hees and the job was instead awarded to a woman in her early twenties. In March 2008, Barker met with her direct supervisor to complain that she had been experiencing a pattern of adverse treatment, including being overlooked for project assignments and not receiving support comparable to that provided to her co-workers.

According to Barker, these complaints went unheeded. Finally, in May 2008, Barker was notified that she was being terminated, as part of a general reduction in workforce affecting all of UBS. According to Barker, she was among the five oldest employees in the Equities Business Management section and was one of five individuals over the age of forty terminated, out of the eight total employees in her group who were discharged as a result of the reduction in force.[3]

In August 2008, Barker filed a complaint with the Occupational Safety and Health Administration ("OSHA") claiming that her work reconciling the exchange seat shares was protected activity under the federal Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and that her efforts on that project contributed to her termination. In September 2009, OSHA found that Barker's alleged protected activity was not a contributing factor to her discharge. Barker appealed this ruling, but later informed the Administrative Law Judge that she would rather proceed directly in federal court. On March 2, 2009, Barker also filed a discrimination charge with the Equal Employment Opportunity Commission and received a "right to sue" letter.

## II.	Discussion

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal citations omitted). In determining whether the plaintiff has met this standard, the

---

[3] Barker was fifty-five years old when she filed this complaint in 2009.

Court must accept the allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).

    A.    Sarbanes-Oxley Whistleblower Claim

The whistleblower provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, provides employees of publicly traded companies with whistleblower protection, prohibiting employers from terminating, or otherwise retaliating against, such employees when they report "potentially unlawful conduct" that has occurred or is in progress. See 18 U.S.C. § 1514A; Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008). To state a prima facie case pursuant to this retaliation provision, a plaintiff must plead that "(1) [s]he engaged in protected activity; (2) the employer knew of the protected activity; (3) [s]he suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." O'Mahony v. Accenture Ltd., 537 F. Supp. 2d 506, 510 (S.D.N.Y. 2008). UBS disputes only that Barker was engaged in protected activity and that such activity was a contributing factor in her discharge.

*Protected Activity*

The first disputed element in this case involves the first prong of Barker's prima facie case, that is, whether Barker engaged in "protected activity" within the meaning of the Sarbanes-Oxley Act. Section 1514A defines protected activity as the providing of information regarding conduct the employee "reasonably believes constitutes" a violation: of 18 U.S.C. §§ 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud

against shareholders. 18 U.S.C. § 1514A(a)(1). The plaintiff's "reasonable belief" is based on the knowledge available to her, taking into consideration the plaintiff's training and circumstances. See Pardy v. Gray, No. 07 Civ. 6324, 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008). The plaintiff's belief contains both subjective and objective components, meaning that the plaintiff must show not only that she believed the conduct constituted a violation, but that a reasonable person in the plaintiff's position would have believed that the conduct constituted a violation. Welch, 536 F.3d at 277. Further, when determining the reasonableness of a plaintiff's belief that shareholder fraud may have occurred, the employee's belief must "at least approximate the basic elements of a claim for securities fraud." Day v. Staples, Inc., 555 F.3d 42, 55 (1st Cir. 2009). Thus, Barker must plead an objectively reasonable belief that UBS intentionally misrepresented, or omitted, certain material facts to investors which led to the possibility of financial loss. See id. at 56.

      Barker appears to have had both a subjective and objectively reasonable belief that UBS's failure to properly record the exchange seat shares could subject the company to federal liability. Barker's complaint indicates that she informed various individuals at UBS that she believed the failure to disclose the exchange seat assets on UBS's balance sheet was a significant problem. Indeed, after initial conversations with her supervisor, Sinni, produced no action, Barker continued to seek out other management employees to whom she could express her concern. As Barker is not a lawyer, nor does she appear to have any specialized knowledge of federal securities law, it seems objectively reasonable that she would imagine unreported assets valued subsequently at over $80 million substantial enough to trigger federal scrutiny.

Additionally, while certain employees at UBS did encourage Barker in her investigation, her complaint asserts valid reasons why she could still believe an intentional misrepresentation was occurring. A reasonable person could find that Barker's supervisors were attempting to cover up the incorrect reporting, based on the initial lack of response by Sinni, coupled with Hees's instructions to Barker that she was not to speak of the exchange seat discrepancy, as well as the fact that a meeting was held about how to "spin" the accounting error. That Barker felt obligated to approach Mia Edwards, head of UBS's Legal Compliance Division, for advice about disclosure indicates that she believed her supervisors were unlawfully encouraging her to conceal important information that had legal significance for shareholders.

UBS argues that Barker cannot adequately plead a Sarbanes-Oxley shareholder fraud claim because the discrepancy she unearthed was not material, a general requirement of shareholder fraud. A fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of the information made available. See Livingston v. Wyeth, Inc., 520 F.3d 344, 352 (4th Cir. 2008). Though a fraud claim brought under the Security and Exchange Commission's Rule 10b-5 may contain a materiality component, section 1514A of the Sarbanes-Oxley Act does not contain an independent materiality requirement. See Welch, 536 F.3d at 276. As such, the plaintiff does not need to prove the fraud was actually material, but rather only that she held an objectively reasonable belief that it was. Here, Barker asserts that she had discovered by September 2007, that a quarter of UBS's exchange seat shares were either incorrectly accounted for or not included at all on UBS's records. No matter the end value of these shares, the discrepancy could seem objectively serious enough to warrant shareholder concern. UBS's

balance sheet was fundamentally inaccurate—a fact that could certainly affect stock price and value. See Vodopia v. Koninklijke Philips Elecs., N.V., 09-4747-cv, 2010 WL 4186469, at *3 (2d Cir. Oct. 25, 2010) (noting that a plaintiff's Sarbanes-Oxley claim brought under a shareholder fraud theory would have been more persuasive had the plaintiff alleged that the misinformation he had reported would have been included in a public report that could have possibly misled investors).

Read with regard to the Rule 12(b)(6) standard, Barker's complaint pleads a reasonably objective belief that UBS's conduct was in violation of federal law protecting shareholders. As such, her activity can be considered protected activity.

*Contributing Factor*

To survive a motion to dismiss, Barker must also plead a plausible claim that her protected activity was a contributing factor in the termination of her employment. A contributing factor is "any factor which, alone, or in connection with any other factors, tends to affect in any way the outcome of the decision." Pardy, 2008 WL 2756331, at *5. The contributing factor test is broad and is a relatively low burden for a plaintiff to meet. See Grove v. EMC Corp., 2006-SOX-99, at 26 (ALJ July 2, 2007). There are numerous facts that courts can consider when deciding if the protected activity was a contributing factor in the ultimate employment decision, including the amount of time between the protected activity and the adverse employment action, the existence of a strained relationship between the party and the employer, any isolation of the employee from the company, and changed performance evaluations. See Mahony v. KeySpan Corp., No. 04 CV 554, 2007 WL 805813, at *6 (E.D.N.Y. Mar. 12, 2007).

Barker's termination occurred seven months after she completed her work on the exchange seat assignment. However, she alleges that UBS's retaliation included more than just her discharge - it also involved poor performance reviews and sudden, undesirable assignments. UBS argues that Barker cannot demonstrate any "contributing factor" because she was actually rewarded by corporate management for her work on the exchange seat project through the "Thank You Award," bestowed upon her in November 2007. UBS also points to Barker's admission that certain UBS personnel encouraged her to complete the exchange seat audit as evidence that Barker's work was not a factor in the discharge decision. Additionally, UBS justifies Barker's termination by reminding the court of the precarious financial situation of UBS (and many other large financial corporations) during the winter of 2008.

The "contributing factor" standard, however, is low and an employee's participation in protected activity need only be one factor in the termination decision. Other factors, like the financial difficulties of a corporation, may also play a role. Further, when reading Barker's complaint in the light most favorable to the plaintiff, it is plausible that the negative employee performance evaluation (authored by supervisor Hees, who Barker expressly describes as discouraging her efforts) may have played a part in UBS's selection of Barker for termination.

For these reasons, this Court finds that Barker has adequately pled a prima facie Sarbanes-Oxley Act whistleblower claim and UBS's motion to dismiss this claim is denied.

B. Age Discrimination in Employment Claim

The ADEA, 29 U.S.C. § 623, makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1). Although claims of age discrimination are governed by the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), a plaintiff is not required to plead the elements of a prima facie case to survive a motion to dismiss. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511–12 (2002) (finding it sufficient that petitioner alleged he was terminated because of his age and national origin, detailed events leading to his termination, and provided ages and nationalities of individuals involved in his termination); see also Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. Mar. 8, 2010) (noting that a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, the claim must be facially plausible).

However, even though establishing a prima facie case of age discrimination is not necessary to survive a motion to dismiss, courts do use the standard as a guidepost when determining whether the plaintiff has provided the defendant with fair notice of her claim, as required by the Federal Rules of Civil Procedure. See Doverspike v. Int'l Ordinance Techs., No. 09-CV-00473F, 2010 WL 986513, at *5 (W.D.N.Y. Mar. 17, 2010); Chacko v. Worldwide Flights Servs., Inc., No. 08-CV-2363, 2010 WL 424025, at *3 (E.D.N.Y. Feb. 3, 2010). Thus, a plaintiff asserting an ADEA claim should demonstrate that (1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).

Here, there is no dispute about the first three elements. Instead, UBS argues that Barker has not, and cannot, show that she was fired under circumstances giving rise to an inference of discriminatory intent. Discriminatory intent may be derived from a variety of circumstances

including employer criticisms of the plaintiff's performance using degrading, age-related terms, invidious comments about others in the employee's protected group, the transferring of plaintiff's duties to younger employees, more favorable treatment of employees not in the protected group, the sequence of events leading to plaintiff's discharge, or the termination of two out of three older employees but no younger employees.  See Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009).

Barker describes several incidents as evidence of age discrimination.  First, she alleges that in both January 2006 and January 2008, women twenty years her junior were promoted to higher positions than she.  Barker presented no evidence, however, that she ever applied for those positions or expressed an interest in advancing to those positions.  More importantly, these promotion claims are time-barred under the ADEA.  A plaintiff claiming a violation of the ADEA may not assert claims based on events taking place more than three hundred days before the submission of a charge of discrimination in the Equal Employment Opportunity Commission ("EEOC").  See Lomako v N.Y. Inst. of Tech., No. 09 Civ. 6066, 2010 WL 1915041, at *4 (S.D.N.Y. May 12, 2010) (citing 42 U.S.C. 2000e-5(e)(1)).  Barker's complaint was filed with the EEOC on March 2, 2009.  As such, actions that occurred in January 2006 and January 2008 are time-barred.

Second, Barker alleges that when she was terminated as part of UBS's reduction in its workforce, she was in the top five in terms of age in her business group and was one of five employees over forty years old terminated (out of eight total individuals).  However, individuals under the age of forty were also discharged in UBS's severance program.  Further, there is no allegation that she was replaced by a younger worker or that anyone ever made any comments or

references to her age. Barker's facts alone do not state a plausible claim for relief under the ADEA. See Gillman v. Inner City Broad. Corp., No. 08 Civ. 8909, 2009 WL 3003244, at *6 (S.D.N.Y. Sept. 18, 2009) (noting that listing thirteen individuals terminated after reaching the age of forty without more information about the reasons for their termination, or specific employment practices by the defendant, does not make out a plausible age discrimination claim).

For these reasons, this Court finds that Barker has not pled an adequate ADEA claim and UBS's motion to dismiss this claim is granted.

### III. Conclusion

For the reasons set forth above, UBS's motion to dismiss [Dk #19] is GRANTED with respect to Barker's ADEA claim. The ADEA claim is dismissed without prejudice and plaintiff may amend the complaint in accordance with this opinion. As to all other claims in the Complaint, the Defendant's motion to dismiss is DENIED.

SO ORDERED this 26th day of January 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**