UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARY J. BARKER,<br>    Plaintiff, | :<br>:<br>: | CIVIL ACTION NO.<br>3:09-CV-2084 (JCH) |
| v. | :<br>: | |
| UBS AG and UBS SECURITIES, LLC,<br>    Defendants. | :<br>:<br>: | MAY 22, 2012 |

**RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 53)**

**I.    INTRODUCTION**

Plaintiff, Mary Barker, brings this case against UBS AG and its wholly-owned subsidiary, UBS Securities, LLC (collectively "defendants" or "UBS"), alleging that defendants terminated her employment in violation of the Sarbanes-Oxley Act's whistleblower provision (hereafter "SOX"), 18 U.S.C. § 1514A.[1]  Defendants now move for summary judgment.

**II.   STATEMENT OF FACTS**

Barker began working at UBS in 1998, and at the time of her termination, worked as an Associate Director in the Business Management Group of the Equities Chief Operating Officer's office.  L.R. 56(a)(1) Stmt. ¶¶ 21–22; L.R. 56(a)(2) Stmt. ¶¶ 21–22. Barker completed her undergraduate degree while working full-time for UBS.  L.R. 56(a)(1) Stmt. ¶ 26; L.R. 56(a)(2) Stmt. ¶ 26.  In working towards her degree, Barker completed several entry level accounting courses, a law course, an advanced business management course, and a course on market risk.  Id.  In addition, while working at

---

[1] Barker originally brought a claim pursuant to the Age Discrimination in Employment Act as well; however, the court (Droney, J.) previously dismissed this claim.  See Doc. No. 40.

1

UBS, Barker completed an internal online compliance requirement regarding identifying different kinds of risk.  See L.R. 56(a)(2) Stmt. ¶ 27.

Traditionally, a firm must own a minimum number of "exchange seats" on a given trading exchange, such as the New York Stock Exchange (hereafter "NYSE"), in order to trade on that exchange.  See L.R. 56(a)(1) Stmt. ¶¶ 50–51; L.R. 56(a)(2) Stmt. ¶¶ 50–51.  In early 2006, UBS's proprietary trading desk (hereafter "Prop Desk") began acquiring, as an investment, additional seats on exchanges that were becoming privately held companies and converting exchange seats into shares in the newly formed corporation.  See L.R. 56(a)(1) Stmt. ¶ 53; L.R. 56(a)(2) Stmt. ¶ 52.  Ownership in the new corporation was allocated based on exchange seat ownership.  See id.  These types of changes were occurring on numerous trading exchanges around this time, resulting in changes to the minimum number of exchange seats or exchange shares necessary to trade on various exchanges.  See L.R. 56(a)(1) Stmt. ¶ 56; L.R. 56(a)(2) Stmt. ¶ 56.  In 2006, in connection with her responsibilities concerning the administration of UBS's Prop Desk's exchange holdings, Barker assisted in reconciling the NYSE exchange seats held by the Prop Desk only into one consolidated inventory.  L.R. 56(a)(2) Stmt. ¶ 55.

Defendants assert that, due to these changes in the industry, Equities senior management sought to better understand UBS's exchange holdings on a uniform, consolidated basis and assigned Barker to reconcile the holdings (hereafter "the reconciliation project").  See L.R. 56(a)(1) Stmt. ¶¶ 58, 60.  Barker asserts that the reconciliation project came about after she obtained information regarding firm-wide holdings from each of the exchanges as part of her work with the Equities Exchange

Traded Derivatives Desk and discovered reporting discrepancies. See L.R. 56(a)(2) ¶ 58; 67. Barker asserts that she assembled a team of individuals who worked to reconcile the portfolio of UBS's exchange assets which were unaccounted for, and that over the course of May 2007, the team accumulated a list of discrepancies for exchange seats, shares, or both not accounted for on UBS's balance sheet. See L.R. 56(a)(2) Stmt. ¶ 62.

Until around June 2007, Barker reported directly to Angela Sinni and indirectly to Gerald Hees. See L.R. 56(a)(2) Stmt. ¶ 29. Barker then began reporting directly to Hees. See id. Around July 2007, Hees became directly responsible for overseeing Barker's work on the reconciliation project and maintained that supervision until he was terminated in May 2008. See L.R. 56(a)(2) Stmt. ¶ 28–29. In the fall of 2007, Kevin Milgram became Barker's supervisor. See L.R. 56(a)(1) Stmt. ¶ 28; L.R. 56(a)(2) Stmt. ¶ 28.

In addition to Barker, at least ten UBS employees worked on the reconciliation project. L.R. 56(a)(1) Stmt. ¶ 63; L.R. 56(a)(2) Stmt. ¶ 63. Barker asserts that senior management first became aware of the project after Hees updated them in September 2007, following a meeting where he discussed how to "spin" the errors and omissions related to the firm's exchange holdings with another employee. See L.R. 56(a)(2) Stmt. ¶ 66. In August 2007, Barker provided Hees with a draft "gap analysis," a report regularly prepared at UBS to identify a gap in processes. L.R. 56(a)(1) Stmt. ¶¶ 76–77; L.R. 56(a)(2) Stmt. ¶¶ 76–77. The parties dispute whether Hees provided any edits to Barker with regard to this gap analysis. L.R. 56(a)(1) Stmt. ¶ 78; L.R. 56(a)(2) Stmt. ¶ 78.

The parties dispute whether Hees ever instructed Barker to refrain from discussing the reconciliation project with UBS's Operational Risk Control group. L.R. 56(a)(1) Stmt. ¶ 83; L.R. 56(a)(2) Stmt. ¶ 83. Barker asserts that around August 8, 2007, Hees reprimanded her for discussing the reconciliation project with Operational Risk and directed her not to disclose anything further about the project outside of the Equities department. See L.R. 56(a)(2) Stmt. ¶ 83.

John Ingrilli became the Chief Operating Officer of Equities around September 2007. L.R. 56(a)(2) Stmt. ¶ 85. On September 19, 2007, Hees presented the results of the reconciliation project to UBS senior executives, including Ingrilli. See L.R. 56(a)(2) Stmt. ¶ 92. On September 24, 2007, Hees instructed Barker that she should not discuss the reconciliation project with Ingrilli directly. See L.R. 56(a)(1) Stmt. ¶ 97; L.R. 56(a)(2) Stmt. ¶ 97. UBS asserts that this instruction was prompted by Ingrilli's dissatisfaction with Barker's work product; however, Barker contends that she had not presented any work product to Ingrilli prior to receiving this instruction from Hees. See L.R. 56(a)(1) Stmt. ¶ 92; L.R. 56(a)(2) Stmt. ¶ 92.

Barker admits that she did not use the words "fraud" or "violation of securities laws" in her gap analysis, or when reporting her work to various superiors. See L.R. 56(a)(1) Stmt. ¶¶ 103–04, 106–07; L.R. 56(a)(2) Stmt. ¶¶ 103–04; 106–07. The exchange holdings identified in Barker's gap analysis totaled less than $200 million. L.R. 56(a)(1) Stmt. ¶ 125; L.R. 56(a)(2) Stmt. ¶ 125. As a result of the reconciliation project, UBS sold some of its exchange holdings, resulting in over $50 million in revenue. See L.R. 56(a)(1) Stmt. ¶¶ 136–37; L.R. 56(a)(2) Stmt. ¶¶ 136–37. Hees nominated Barker for a "Thank You Award" for her work on the reconciliation project,

which Barker received on November 23, 2007.  L.R. 56(a)(1) Stmt. ¶¶ 138–40; L.R. 56(a)(2) Stmt. ¶¶ 138–40.

During a March 26, 2008 meeting with Milgram, Barker informed him that she felt that Hees was overlooking her for projects and not adequately supporting her, resulting in her feeling that she was being retaliated against or constructively discharged.  L.R. 56(a)(1) Stmt. ¶ 128; L.R. 56(a)(2) Stmt. ¶ 128–29.  An internal investigation found that no unfair treatment had occurred.  L.R. 56(a)(1) Stmt. ¶ 132; L.R. 56(a)(2) Stmt. ¶ 132.  On or about May 6, 2008, UBS conducted a large-scale reduction in force, which resulted in Barker's termination.  L.R. 56(a)(1) Stmt. ¶ 10; L.R. 56(a)(2) Stmt. ¶ 10.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific

5

facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

**IV.   DISCUSSION**

    A.    Prima Facie Case

Section 1514A of Title 18 the United States Code makes it unlawful for publicly traded companies to:

> discharge . . . or in any other manner discriminate against an employee in the terms or conditions of employment because of any lawful act done by the employee . . . to provide information . . . or otherwise assist in an investigation regarding any conduct the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

To demonstrate a violation of section 1514A, a plaintiff bears the initial burden of setting forth a prima facie case. See Day v. Staples, Inc., 555 F.3d 42, 53 (1st Cir. 2009). To establish a prima facie case, the plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) the employer knew of the protected activity; (3) she suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the

unfavorable action.  See Vodopia v. Koninklijke Philips Electronics, N.V., 398 Fed. Appx. 659, 662 (2d Cir. 2010).  Courts have construed whistleblower protection broadly.  See, e.g., Mahoney v. Keyspan Corp., 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) ("Given that SOX is a statute designed to promote corporate ethics by protecting whistleblowers from retaliation, it is reasonable to construe the statute broadly.").  If the plaintiff meets her burden, the defendant may then avoid liability if it can prove by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected activity.  See Day, 555 F.3d at 53.

        1.      Protected Activity

UBS first argues that Barker cannot establish a prima facie case because she cannot show that she engaged in protected activity.  To demonstrate protected activity, a plaintiff must show that she "had both a subjective belief and an objectively reasonable belief that the conduct [s]he complained of constituted a violation of relevant law."  See Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008) (internal quotation omitted).  The employee's communications "'must definitively and specifically relate to [one] of the listed categories of fraud or securities violations [in] 18 U.S.C. § 1514A(a)(1).'"[2]  See Vodopia, 398 Fed. Appx. at 662–63 (quoting Van Asdale v. Int'l Game Tech., 577 F.3d 989, 996–97 (9th Cir. 2009)).  That is, the employee must

---

[2] The Second Circuit has expressly adopted the "definitively and specifically" standard; however, a recent decision by the Administrative Review Board of the Department of Labor, the agency charged with enforcing the SOX whistleblower protections, see 18 U.S.C. § 1514A(b), indicates that the "[definite and specific] standard . . . has evolved into an inappropriate test and is often applied too strictly."  See Sylvester v. Parexel Int'l LLC, ARB Case No. 07-123 (May 25, 2011) at 18.  Instead, the ARB explains that "the critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law."  See id. at 19 (emphasis in original).  ARB decisions are entitled to Chevron deference by this court.  See Day v. Staples, Inc., 555 F.3d 42, 54, n. 7 (1st Cir. 2009).  As the court concludes that Barker has come forward with evidence upon which a reasonable factfinder could find that she meets the higher "definite and specific" standard adopted by the Second Circuit, however, the court need not resolve the issue of whether this recent decision by the ARB affects Second Circuit precedent at this time.

provide factually specific information to the employer regarding conduct she believes to be illegal; it is not necessary for the employee to cite to a specific code section she believes was violated.  See Welch, 536 F.3d at 276.  The court evaluates the objective reasonableness of an employee's belief based on the knowledge available to a reasonable person in the same factual circumstances and with the same training and experience as the employee.  See Allen v. Admin. Review Bd., 514 F.3d 468, 477 (5th Cir. 2008).

UBS contends that Barker cannot show that she engaged in protected activity for several reasons.  First, UBS argues that Barker was simply performing her job and is not entitled to whistleblower protection.  See Mem. Supp. Mot. at 20–21.  Next, UBS contends that Barker could not, and did not, reasonably believe that she was blowing the whistle on securities fraud because it was unreasonable for her to believe that UBS was either engaged in fraud or that the exchange seat discrepancies were material to shareholders.  See id. at 22–26.

UBS asserts that Barker cannot establish that she engaged in protected activity because senior managers requested and supported the reconciliation project, commended Barker and her team on her work, and helped bring about a conclusion to the project.  See Mem. Supp. Mot. at 20.  At least one court, relying on cases discussing other whistleblower laws, has found that a plaintiff must "'step outside [her] role' and take additional action" in order to demonstrate protected activity.  See Riddle v. First Tennessee Bank, 2011 WL 4348298, at *8 (M.D. Tenn. Sept. 16, 2011).  The ARB, however, has made clear that an employee may engage in protected activity even where the employee is discharging her duties.  See Robinson v. Morgan-Stanley, ARB

8

Case No. 07-070 (Jan. 10, 2010) at *24–25 ("[Section 1514A] does not indicate that an employee's report or complaint about a protected violation must involve actions outside the complainant's assigned duties.").

Barker contests UBS's assertion that senior management commenced the reconciliation project and, instead, asserts that senior management was not aware of the project until Hees briefed them in September 2007. See L.R. 56(a)(2) Stmt. ¶¶ 58, 66. Further, Barker contends that she went beyond her original assignment in pursuing the reconciliation project by contacting the exchanges. See Barker Aff. ¶¶ 15 –20. In addition, Barker asserts that Hees reprimanded her for discussing the reconciliation project with Operational Risk, held a meeting where he discussed how to "spin" Barker's findings regarding errors and omissions in UBS's exchange holdings, and instructed Barker not to discuss her findings with Ingrilli or anyone else in senior management. See Barker Aff. ¶¶ 39, 47–48, 51. Given these disputes, material issues of fact exist as to whether Barker engaged in protected activity.

UBS then argues that Barker cannot demonstrate that she held either a subjective or objective reasonable belief that "she was blowing the whistle on securities fraud." See Mem. Supp. Mot. at 21–26. An employee does not need to specifically allege fraud, or reference a specific statute in order to engage in protected activity. See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 997 (9th Cir. 2009) (finding a plaintiff's statements definitively and specifically related to shareholder fraud even where plaintiff did not use the word "fraud" and only "may have" used the term "Sarbanes-Oxley" or "SOX"). In addition, an employee need not demonstrate that a violation of law actually occurred. See Guyden v. Aetna, Inc., 544 F.3d 376, 384 (2d Cir. 2008). Rather, it is

9

sufficient that an employee demonstrates that "she reasonably believed that the defendant's conduct violated federal law." See id. (internal quotations omitted). Barker asserts that she advised multiple people at UBS, including Sinni, Hees, Ingrilli, the Head of Compliance, and members of Equities and Operational Risk of her concerns regarding the firm's inaccurate and misleading reporting of its exchange assets. See Mem. Opp. Mot. at 19; Barker Aff. ¶¶ 43, 57, 61. In addition, Barker testified that she "had no idea" whether someone had intentionally hidden the exchange seat shares. See Levin Aff., Ex. M at 226–27. Taking this evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that Barker had a subjectively reasonable belief that UBS had violated the law by reporting inaccurate information to its shareholders and adequately conveyed those concerns to various members of management. See Van Asdale, 577 F.3d at 1002 ("Requiring an employee to essentially prove the existence of fraud before suggesting the need for an investigation would hardly be consistent with Congress's goal of encouraging disclosure.").

Next, UBS argues that it was not objectively reasonable for Barker to believe that UBS had violated the law because, given her education and training, she should have known that the discrepancies discovered through the reconciliation project were not material to UBS's shareholders. See Mem. Supp. Mot. at 23–25. Section 1514A does not contain "an independent materiality requirement." See Welch, 536 F.3d at 276. Consequently, Barker may satisfy this requirement so long as she demonstrates that she held an objectively reasonable belief that the conduct she complained of was in

violation of federal law.³  See Day, 555 F.3d at 55 ("[Section] 1514A requires . . . an objectively reasonable belief that conduct complained of constituted a violation of the relevant law set out in the statute."); Zinn v. Am. Commercial Lines Inc., ARB Case No. 10-029 (Mar. 28, 2012) at 9 ("[Plaintiff] need not describe an actual violation of law, as an employee's whistleblower communication is protected where based on a reasonable, but mistaken, belief that the employer's conduct constitutes a violation of one of the six enumerated categories of law under Section 806."); Klopfenstein v. PCC Flow Techs. Holdings, Inc., ARB Case No. 04-149 (May 31, 2006) at 12 ("SOX protection applies to the provision of information regarding not just fraud, but also "violation of . . . any rule or regulation of the Securities and Exchange Commission.").

Barker points out that she only obtained her undergraduate degree in Business and Technology the day before she was terminated at UBS.  Barker Depo. at 376.  In completing her degree, she took entry level accounting classes and a law class that "may have" included ethics.  See id. at 379.  In addition, she took an internal compliance course at UBS regarding "all kinds of risk" that she completed in a couple of hours.  See id. at 380.  Finally, Barker asserts that, while she was familiar with a particular sub-part of UBS's balance sheet, she was not familiar with UBS's overall balance sheet.  See Barker Aff. ¶ 8. While Barker's education and background may indicate some familiarity with securities regulation, it does not indicate any particular expertise which would make it objectively unreasonable for Barker to believe that UBS's failure to properly disclose

---

³ In her Complaint, Barker alleges that she believed "UBS's conduct constituted a violation of federal securities law, including Rule 10(b)(5)."  See Compl. ¶ 83.  Consequently, UBS's assertion that Barker's Complaint was limited to Rule 10(b)(5) only and that she now seeks to "change her theory of the case" appears unfounded.  See Reply at 9.  Further, even if Barker had solely alleged a violation of Rule 10(b)(5), she is not required to prove the elements of a 10(b)(5) violation in order to state a prima facie cause of action under Section 1514A.  See Sylvester, ARB Case No. 07-123 at 22 ("[A] complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation").

11

its exchange assets constituted a violation of securities regulation. See, e.g., Harkness v. C-Bass Diamond, LLC, 2010 WL 997101, at *6 (D. Md. Mar. 16, 2010) (granting summary judgment where plaintiff, a lawyer with twenty years of experience, "had the resources available to her," but failed to conduct any "legal research to ascertain the applicability of various laws"). Taking the evidence regarding Barker's education and experience in the light most favorable to the plaintiff, a reasonable jury could find that Barker held an objectively reasonable belief that UBS's had violated one of the laws specified in section 1514A.

        2.        Employer Knew of Protected Activity

UBS does not appear to challenge Barker's ability to demonstrate that it was aware of Barker's protected activity. See Mem. Supp. Mot. at 26. There is ample evidence in the record of Barker's discussions with Sinni, Hees, and Ingrilli regarding the reconciliation project and her concerns regarding the exchange assets. See L.R. 56(a)(2) Stmt. ¶¶ 105–07. Such discussions were sufficient to alert UBS to Barker's concerns. See Fraser v. Fiduciary Trust Co. Int'l, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) ("A whistleblower must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal.") (quoting Lerbs v. Buca Di Beppo, Inc., 2004 WL 5030304 (U.S.D.O.L. June 15, 2004)). A reasonable jury could find that UBS knew of Barker's activity.

        3.        Unfavorable Personnel Action

Barker suffered an unfavorable personnel action when she was terminated on May 6, 2008. See Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1378 (N.D.Ga. 2004).

### 4. Whether Protected Activity was a Contributing Factor

Finally, Barker must demonstrate that "circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action."[4]  See Vodopia, 398 Fed. Appx. at 662.  "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." See Klopfenstein, ARB Case No. 04-149, at *13.  A plaintiff need not prove that her protected activity was the primary motivating factor in her termination, or that the employer's articulated reason was pretext in order to prevail.  See id.; Halloum v. Intel Corp., ARB Case No. 04-068, at *6 (Jan. 31, 2006).

UBS first argues that Barker cannot demonstrate that any protected activity was a contributing factor in her termination because Ingrilli did not have knowledge of Barker's protected activity and made the decision to terminate Barker's employment without any involvement from Hees.  See Mem. Supp. Mot. at 26–27.  Barker asserts that she met with Ingrilli on October 19, 2007, and informed him of the meeting where Hees discussed how to "spin" Barker's findings, as well as Hees's instruction to her not to raise her concerns regarding the reconciliation project with Ingrilli directly.  See

---

[4] At oral argument, UBS asserted that, because Barker was separated as part of a reduction in force, she must meet a higher burden of proof by pointing to an individual who should have been terminated instead of her.  This argument appears to be based on Sixth Circuit precedent with regard to age discrimination claims pursuant to the Age Discrimination in Employment Act ("ADEA").  See Reply at 2 (citing Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 265 (6th Cir. 2010)).  Under Sixth Circuit precedent, where an employee who was terminated during a reduction in force pursues an ADEA claim, the employee must show "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons."  See Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1126 (6th Cir. 1998) (internal quotation omitted).  The court does not read this caselaw to require that a plaintiff specifically point to a co-worker who should have been terminated instead of her.  Further, it does not appear that the Second Circuit has even adopted this requirement with regard to ADEA claims.  See Duncan v. New York City Transit Auth., 45 Fed. Appx. 14, 15–16 (2d Cir. 2002).  Finally, defendants have not cited the court to any cases applying this standard to a SOX whistleblower claim.  Accordingly, the court does not find Barker's inability to identify an employee in her group who should have been included in the reduction in force instead of her to be fatal to her case.  See L.R. 56(a)(1) Stmt. ¶ 20; L.R. 56(a)(2) Stmt. ¶ 20.

Barker Aff. ¶ 61.  In addition, Barker asserts that she told Ingrilli that she had expected Hees to report her findings from the reconciliation project to senior management and, if he had not done so, she felt obligated to do so.  See id.  Further, Barker points to evidence from which a jury could conclude that Ingrilli consulted with Hees prior to deciding to terminate Barker's employment.  See Shore Aff., Ex. C at 100.[5]  On the basis of this evidence, a jury could reasonably conclude that Ingrilli was aware of Barker's protected activity, and it was a contributing factor in his decision to terminate her employment.

Next, UBS argues that the passage of time between Barker's protected activity and the termination of her employment negates any inference of causation.  Mem. Supp. Mot. at 28–29.  While causation may be inferred from timing alone where an adverse employment action closely follows the exercise of protective activity, the Second Circuit has declined to "define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship."  See Gorman-Bakos v. Cornell Coop of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).  Generally, where a plaintiff relies solely on temporal proximity to establish causation, the amount of time between the employer's knowledge of protected activity and an adverse employment action must be "very close."  See Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotation omitted); Garrett v. Garden City Hotel, Inc., 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (noting that "in the absence of other evidence of defendant's retaliatory motive [a time lapse of two and a half months] precludes a finding of a causal connection between the protected activity and the

---

[5] UBS points out in its Reply that Milgram later clarified his answer and stated that Ingrilli did not receive input from anyone else in connection with his decision to terminate Barker.  See Levin Decl. Ex. L at 114.  This discrepancy raises an issue of fact for the jury.

14

adverse employment action"). Where other factual circumstances support the conclusion that a plaintiff's protected activity was a contributing factor in her termination, however, a reasonably jury can find this prong to be satisfied. See Gorman-Bakos, 252 F.3d at 555 ("We are particularly confident that five months is not too long to support such an allegation [of causal connection] where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring between December 1997 and April 1998."); Mahony, 2007 WL 805813, at *6 ("A reasonable juror could find that the string of retaliatory acts culminating in Plaintiff's termination is evidence that Plaintiff's protected activity was a contributing factor in the adverse employment action."); see also Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45–46 (2d Cir. 1980) (holding that plaintiff has established a causal connection where an eight month gap existed between his filing an EEOC complaint and retaliatory action).

Barker testified that two months after she met with Ingrilli regarding the reconciliation project, Hees removed her from consideration for promotion.[6] See Levin Decl., Ex. S. In addition, Barker states that, following her 2007 performance review which she considered to be disappointing, Milgram told her that Hees had sought to give her an even lower rating, but Milgram had told him that a lower rating was inappropriate. See Barker Aff. ¶ 69. In addition, Barker contends that Hees overlooked her for assignments and stopped interacting with her. Id. at ¶ 73. Finally, on May 6, 2008, Barker was fired. Id. at ¶ 76. Taking this evidence in the light most favorable to the plaintiff, and considering that Barker need only show that her protected activity was

---

[6] At oral argument, UBS argued that Hees's decision to remove Barker from consideration for a promotion does not tend to show causation because Hees initially recommended Barker for a promotion in August 2007, after he became aware of her work on the reconciliation project. The record, however, is ambiguous with regard to when Hees became fully aware of Barker's work on the reconciliation project. See Barker Aff. ¶ 61.

15

a factor which tended to affect Ingrilli's decision, a reasonable jury could determine that, by demonstrating a string of actions which began in relatively close proximity to Barker's protected activity and culminated with her termination, Barker has satisfied this causation requirement.

> B.     Burden Shifting Analysis

Though Barker sets forth sufficient evidence for a reasonable jury to conclude that she has met her burden of establishing a prima facie case, UBS may still obtain summary judgment if it shows by clear and convincing evidence that it would have terminated Barker even absent any protected activity. See 18 U.S.C. § 1514A(b)(2)(A); Van Asdale, 577 F.3d at 1004. UBS presents convincing evidence that the firm was experiencing extreme financial hardship at the time Barker's employment was terminated, and a reduction in force was necessary. See L.R. 56(a)(1) Stmt. ¶¶ 1–9. However, such hardship does not explain why Barker in particular was selected for termination.

UBS first points to Barker's performance evaluations and deposition testimony from various supervisors as evidence of her "performance and interpersonal issues." See L.R. 56(a)(1) Stmt. ¶ 32–47. While these performance evaluations do indicate some performance issues, many also describe Barker in complimentary terms. See, e.g., Levin Decl., Ex. O at 11–14 (indicating that Barker "had a successful year," "builds strong relationships" with outside groups, "showed a great deal of [patience] and endurance," "seems to enjoy what she does," and is "highly motivated").

UBS next contends that Ingrilli chose Barker in particular because he considered her to be one of the lowest performers in his group. Mem. Supp. Mot. at 30. UBS

argues that Ingrilli was displeased with Barker's work because he had observed inaccuracies in her work product and deficiencies in her presentations. See L.R. 56(a)(1) Stmt. ¶ 16. Barker asserts that she had not presented any work product to Ingrilli prior to Hees's instruction to her not to approach Ingrilli directly with any of her work, and that the only error Ingrilli ever pointed out to her was one numerical error. See Barker Aff. ¶ 51. Further, Ingrilli acknowledged that he could not attribute any specific error in the reconciliation project work product to Barker individually. See L.R. 56(a)(2) Stmt. ¶ 90; Shore Decl., Ex. E at 65.

Taking the evidence in the light most favorable to the plaintiff, such evidence does not provide clear and convincing evidence that Barker would have been terminated regardless of any protected activity. Consequently, summary judgment is inappropriate.[7]

## V.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 53) is **denied**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 22nd day of May, 2012.

        /s/ Janet C. Hall
        Janet C. Hall
        United States District Judge

---

[7] As the court denies summary judgment, this case is ready for trial. At oral argument, defendants asserted that this case would be tried before the court rather than a jury. It is the court's understanding that Barker is entitled to a jury trial, and has made a jury demand. See 18 U.S.C. § 1514A(b)(2)(E); Doc. No. 1.